Edgewell Personal Care Products www.EdgewellPersonalCare.com www.EdgewellPersonalCare.com www.EdgewellPersonalCare.com Good morning, may it please the court. Good morning, Your Honor, Your Honors. Jason Kravitz for Appellant Edgewell Personal Care. With me is my colleague, Daniel Burnham, and in the courtroom is Assistant General Counsel to Edgewell, Robert Rosasco. The heart of this dispute concerns two ratios denoted as A over B and L over W that relate to certain dimensions of a tampon applicator tip. To determine the A over B ratio, you first need to locate the inflection point on the tip. That's a specific point where the barrel begins to taper inwardly. And to determine the L over W ratio, you need to know among other data points the number of petals, the specific dimensions of each petal in the undeformed state, how wide the gaps are between the petals, and perhaps most importantly, where the root ends are for each petal. Okay, wasn't there agreement by the experts with respect to what the disclosure was in the Koch reference that included ratios? No, Your Honor, respectfully, I disagree with that. There was not agreement among the experts. I think that was one of the assumptions. I mean, the district court said that there was, in fact, no material dispute, or genuine issue of material dispute with respect to what Koch teaches. And I think that that was an erroneous statement. In fact, didn't both experts agree that if the tip is elongated, that the A over B ratio would be less than one? And the L over W ratio would be greater than one? No, Your Honor, so. Can we look at page 26 of the district court's opinion? Sure. Because that's where he says that. That's where we got it from. He calls out the expert's testimony in that regard. So are we talking about two different things, or is it your view that he's just mistaken about his reading of the expert testimony? So, very fair question, Your Honor. So, and I think it's two different things. Number one is there was some confusion between whether people were talking about Koch versus a hypothetical, and that's an important distinction. That is not a distinction without a difference. And also there was some confusion about what the actual testimony said. There is no dispute that with respect to the A over B ratio, if you're taking a hypothetical tampon tip with the prior art hemispherical shape, and you're not changing the location of where the inflection point is, if you elongate those petals, your A over B ratio will dip below one. There was no dispute about that, and there is no dispute about that. That doesn't mean that it's below 0.8. More importantly. Right, well the district court didn't say, the district court said one, less than one. Less than one, correct, Your Honor. But the district court also said that that included below 0.8. Okay, so I'm just trying to distill what your disagreement is with respect to the district court. Right. So you're not disputing that this was the expert testimony, and he correctly outlined it. With respect to A over B. With respect to L over W, it's a different analysis entirely, because L over W and A over B are not the same thing. So as I mentioned in my opening remarks, the L over W is dependent upon the number of petals. It's dependent upon the size and shape of those petals, and whether they're all symmetrical or whether they're different. It's dependent upon the length of that curvature in the undeformed state, as opposed to the straight state that the A over B is dependent upon. Most importantly, it's dependent upon where the root ends of the petals are, which is not necessarily the same place as the inflection point. So if the root ends of those petals are in front of the inflection point, then you're gonna have a shorter L, which of course impacts the L over W ratio. If the root ends of the petals are behind the inflection point, you're gonna have a longer L, which of course impacts the L over W ratio. So is one of those under one, and one of those greater than one? Well, Your Honor, I don't mean to be flippant about it, but it depends on where those root ends are. Okay, so can you just look at page 26? I'm just trying to understand what issue you're taking, if any, with what the district court concluded was the expert's agreement here. So you said you agree with AB, which is at the bottom of this paragraph, that he said the AB ratio is less than one, and then he says an LW ratio greater than one, and he cites the expert testimony in footnote nine explaining that. Is anything he says incorrect? I believe it is, Your Honor. I believe with respect to L over W, there was not agreement. What's incorrect? Where in footnote nine is there a mistake? Footnote nine of the district court's decision? Yeah. That's where he cites the expert testimony, confirming what he concludes that you say as well. Because, Your Honor, when someone is asking a hypothetical, you have to have assumptions. And so when Mr. Sheldon, our expert, Edgewell's expert, was being asked at his deposition about certain shapes, they were, and we addressed this in our brief, Your Honor, I thought we addressed it fairly clearly, that there was some mischaracterization of what Mr. Sheldon actually said, and whether he was referring to Koch, or whether he was referring to a hypothetical hemispherical shape that's being modified. And that's a fundamentally different thing, right? Because one is hypothetical and one is prior art. And Mr. Sheldon never testified that, I mean, first of all, what he said about Koch was essentially, I can read it to you exactly, actually. He says, it looks a little more elongated than a hemisphere. That's the sum total of Mr. Sheldon's admission with respect to what Koch teaches, okay? If you then move from Koch to the hypothetical and you say, okay, so what does that mean? If you're leaving, if the inflection point stays where it is, and you're moving from a hemispherical tip to an elongated, something more elongated, that necessarily will mean that the A over B is gonna be less than one. Again, we concede this, Mr. Sheldon conceded that. But the L over W requires five or six different assumptions in order to understand what that range is gonna be. And the patent itself has, I mean, the patent itself contains data. I'm sure your honors looked at it. It's the table in the patent that says, here's five different examples of different shapes that they tested, essentially. And two of them were outside the range of the L over W, the claimed range of the L over W. Those were two that were rejected based on their performance, okay? There's no such data for the A over B ratio in the 075 patent, but it's right there in the L over W. You can find, without too much difficulty, L over W ratios that fall outside the claimed range. And Mr. Sheldon never conceded that simply elongating a hypothetical hemispherical tip is gonna necessarily put you into the L over W range of one to two. Again, it depends on the number of petals we're talking about. In the 075 patent, they reference a shape that has three petals, that fell outside the range. Of course, if you only have three petals. Can I just, I mean, I understand, well, I don't understand what you're saying. Can we just go back to footnote nine? Sure. The second paragraph, I'm on page 26. This is the paragraph describing your expert's testimony, and I understand you think this is a hypothetical, but the last sentence says he also agreed that if one took the hemispherical applicator tip having four petals and elongated a little bit, even a little bit, one would get L over W greater than one. And then he cites, I assume, your expert's testimony. Correct. Is that an inaccurate citation, or is that not answering the question the district court should be answering? I think it's an accurate citation, but I think Mr. Wait, by inaccurate I mean, is that not what the expert said? The expert, Mr. Sheldon, was making assumptions, whether they were articulated or not. He's making assumptions based on the questions he's being asked. He said this. He said that. So, wait, did you answer, Judge Hughes, that it was accurate or inaccurate? I didn't hear. That is an accurate recitation of an answer that Mr. Sheldon gave in being asked questions about a hypothetical. I think the hypothetical put it in the context of a baseball, half a baseball, right? So the hemispherical tip, okay? So Mr. Sheldon didn't explain at that moment that he didn't ask, well, does your hypothetical want me to assume that there were three, four, five, or six petals? Well, the sentence I just read you said he agreed that if one took a hemispherical applicator tip having four petals, so he's at least relying on the four petal hypothetical. Fair point, Your Honor, but he didn't ask for an assumption, whether that assumption is that the four petals are identical. Are they symmetrical? Which, by the way, in Koch, they are not. Koch has four petals that are not perfectly symmetrical. And the reason we know this is through Mr. Hull's testimony and the measurements that Mr. Hull took. So we know that Koch provides for a four petal option that does not have perfectly symmetrical petals, which means that the L over W is gonna be different for the four different petals. And all four petals under the 075 patent need to have an L over W ratio between one and two. So Koch, Koch is a, it's an interesting reference. You're talking about the different sizes of the petals in Koch.  I thought this was just a design patent with a picture. It is just a design patent with a picture, but we're, my. That's not necessarily to scale or anything. It is absolutely not to scale. We're not told anything about that image other than what it presents to the naked eye. We're not given, of course, with the design patent, so we don't have the benefit of a specification telling us what the measurements or dimensions are and whether it is to scale. But what Koch teaches us is that those are not symmetrical petals. You can see, what we showed Mr. Hull during his. Where does Koch teach that? Well, Your Honor, Koch teaches that in conjunction with the testimony and the measurements that Mr. Hull took. So Koch itself does not teach that? Koch teaches very little of it by itself. Koch teaches virtually nothing by itself. I would suggest that Koch teaches almost nothing and is largely irrelevant to the dispute at hand because it does not show us dimensions and it does not show us scale and it does not give us the ability to conclusively or precisely or accurately infer dimensions and measurements, which is, of course, what the primary thrust of Al-Bad's arguments are today is based on or premised on. It may not show dimensions, but it does show a structure that has a configuration that is apparent on its face. It absolutely does, Your Honor. The tip is not hemispherical, it's elongated. It's hard to deny that. I, well, again, Your Honor, our expert testified that in his view, in his expert opinion, it shows a slightly elongated based on a hemispherical tip. But respectfully, I suggest to the court that I disagree that it's hard to dispute that it shows a hemispherical tip. This is an isometric drawing of a, two-dimensional drawing of a three-dimensional product where you have- It's hard to dispute it on appeal when your expert agreed it was elongated. I mean, I don't understand why you use that expert, frankly, but he said it. He said it was elongated, and there are mathematical truths that follow from elongation. There are- Do you agree that the A over B one necessarily follows from elongation? I do agree, if you- Then we're just getting into the L and W, and that all seems to be just further additional hypotheticals. I agree, Your Honor, that if you keep the inflection point where it is and you elongate the petals, and the number of petals remains the same and they're symmetrical, then you're going to have an A over B ratio that dips below one. But I don't agree that it dips below .8 as a mathematical truth. That would require a 20% difference, and our expert never opined that there's a 20% difference. Our expert opined that he doesn't know, because he doesn't know where the inflection point is on Koch. And that's consistent with the law, which is that when you have a drawing, a design- Whether it's a design patent or a utility patent that doesn't have the benefit of dimensions or scale or a specification explaining what those could reasonably be inferred to be, then you don't have the ability to measure this with mathematical precision. And therefore, it's incompetent evidence for that purpose. If this were a case where we were trying to patent a finger grip with five or six concentric circles around it, then Koch would be able to teach us something about the prior art. But with respect to mathematical measurements, Koch doesn't teach us anything about those. Well, it seems to me you're relying on these different ratios, the AB ratio and the LW ratio. But what is it that presents some sort of unexpected result or something? What is it about these ratios that is of any patentable consequence? Okay, Your Honor- And just to clarify what I'm trying to get at here, if I took this pen, which is clearly prior art, and I said, well, all right, I'm gonna invent a pen that is between a half-inch and five-eighths of an inch in diameter, and it's between five and seven inches in length. And that's my claim. The patent office rightfully would say, well, that's of no patentable consequence. It's just a matter of design choice, unless you can show that there's some sort of unexpected result or something of consequence. Isn't that the same here? I respectfully disagree with that comparison, Your Honor, that analogy, because- Well, straighten me out. Sure. A pen is not used for the purpose of insertion into the human body. And so what we're talking about here is something where the inventor said that the shape of this tip, in their view, and they're considered judgment as persons of skill in the art, and they have some data in their patent to support it, at least with respect to the L over W ratio. They viewed that changing the shape of the tip would result in less resistance and less discomfort during the insertion process. And it was a, so that's the utility of it, Your Honor, okay? So in 1999, this patent was new, it was novel, and it was not obvious, and the utility of it- But you're claiming a particular shape based on the ratios. Correct.  that makes it, I mean? Well, it performs its function, Your Honor, and their view was that it provided less surface area, the shape of it was sufficiently different from the prior art that it created a different experience upon, and less resistance and less discomfort upon the insertion process. Whether it's an extraordinary result, I don't think, I think it's beside the point, Your Honor. It was their judgment that this product had utility, it clearly served its purpose, and was functional, and in fact, Edgewell has built a business around it on the place export. Something with an AB ratio of 0.9, for example, would fail that test? Well, on the L over W, Your Honor, according to the patent itself, the L over W ratio- I'm talking about the AB ratio. Okay, we don't know, Your Honor, we don't have that data. 0.8, what is it about 0.8 that's so special? We don't know, with respect to A over B, we don't know that, Your Honor, because it's not specified in the patent. I'm out of time, I- Well, it does say we're in a ratio, AB is at most 0.8. Correct. That's in the patent. No, I'm saying the data supporting any extraordinary performance results is not in the patent. We don't have that data. All right, well, you have exceeded, you've gone through, run through your rebuttal time as well. We'll restore some rebuttal time. Thank you, Your Honor. Thank you. Good morning, Your Honor. David Lowenstein, I'm representing Alibod. I just wanted to address some of the questions that you asked and some of the answers that Mr. Kravitz just gave about this notion of hypothetical. I'm reading from Appendix 3109, and that's what the district court cited, and I believe it was footnote nine that you were just asking about. There's nothing hypothetical about these questions and answers. The question was referring to the time of patent and the question starts around 10. Let's assume there's an isometric drawing. You're able to tell anything about the shape. There's an objection. Just from this illustration, he says no, but it's more elongated than a semisphere, right? It's an illustration, he says. Where exactly are you reading? Sure, I'm on page 68 of the transcript, around line 15 now. 68, line 15, okay. Correct. Yeah. That's not my question. Try to listen to my question because otherwise we're here, I'll skip over the colloquy, okay? And then back onto 69, you're specifically asking me about the tip, was the expert's question. Yes, about the tip. Okay, specifically about the tip, does this look more elongated than a hemisphere? And the question was, that's the question, and I think it looks more elongated than a hemisphere. There's nothing hypothetical about that he says going on, and that's relying on the knowledge as an engineer able to read isometric drawings. Correct, objection. I'm just looking at the picture. So he's looking at Koch, and if you look at Koch, which is in the appendix here, at 12.12, you know, you don't have to believe me, you can just look at it with your own eyes. It's a tapered tip. In fact, in the intercom. I think your friend largely agreed, even though you quibbled a little bit, that Koch shows an elongated tip. Correct. Their expert agreed with that, which answers, at least in part, the A, B question, if we set aside this dispute about 0.8 and one, or whatever it is. But his point, I thought, was Koch doesn't say anything about the LW ratios, even if you assume an elongated tip. And honestly, I thought that the math really is pretty much the same, but I understood him to be saying, well, no, it requires further assumptions. It just isn't supported in Koch, and that their expert didn't agree to it. Well, I think, taking a step back, the district court didn't impose any mathematical limitations on Koch. He said, Koch is this picture, it shows a tapered tip, and from there, the question is, what does a person of ordinary skill in the art do? Are they- So, I guess my question is, how does Koch show the LW ratios? Specifically, does their expert talk about Koch in those terms that we would find undisputed? Well, I think the point that you raised is right on the money. Their position, really from the get-go, is that Koch is a clean slate. It has no ranges, no ratios, it only has a single value, but nobody knows what it is. So, it provides no information. It's as if it were a blank piece of paper. And that's obviously not the case. So, the question then becomes, well, what does Koch show? Koch shows four petals. And then they really go through what I think is some tortured analysis about saying, well, they're really asymmetric. And their expert says, it appears to suggest asymmetric petals. He doesn't say it has asymmetric petals. And keep in mind, they say that Koch has no information. If it has no information, how can it be asymmetric? It's nothing, according to them. So, on one hand, it shows asymmetric petals. On the other hand, it provides no information. Both of those statements can't be true. And then they say that there's a devastating admission because our expert, Mr. Hull, tried to use a computer model. And they said, well, the computer model shows that these points don't line up. They say in, I think, the third statement of issues in this case, that the computer model was defective. But then they're relying on the computer model to show that the Koch patent, which they say has no information, is somehow inconsistent. And so, the bottom line is, Koch is a tapered tip. It has four petals. And the question is, does a person of ordinary skill in the art look at that and say, if I elongate it a little bit, do I get A over B of less than 0.8? And do I get L and W between one and two? And as Judge Lynn pointed out, there's no evidence in the record here that any of these things have any criticality associated with them. And there's no unexpected results. So this is just routine, day-to-day engineering. It's optimization that any number of cases that the panel's been involved in say is not patentable. You can't patent 0.8. And there's a statement in the district court's opinion and in our papers, where Mr. Kravitz admitted that there's really no distinction between 0.7, 0.8, and 0.9 in terms of A, B. And the LW ratio is just a form of optimization. You don't want to have the petals to be too long and skinny because they become too flexible and they would open prematurely. And you don't want them to be too wide because they wouldn't open at all. So it's just a question of where do you find that point? And there's no magic there. It's just routine, day-to-day engineering work. So, you know, the idea that Koch is somehow ambiguous and does or doesn't provide information is really, in my view, I want to say red herring, but it's an overused term. But I mean, if Koch could or couldn't show symmetric or asymmetric petals, it wouldn't comply with 112. And there's the In Re Mata case that says even design patents have to comply with that. So it's really a stretch to say that Koch doesn't provide any information, but it does have asymmetric petals. So I can go on, but I mean, that's the nub of their argument is that Koch doesn't provide any information, but it does provide information to them. So, you know, the idea that a person of ordinary skill wouldn't have come up with these ratios is really not supported by the evidence. And I can go back, really, my presentation is gonna start at the beginning of all this, where tapering, and we cited cases from decades ago that said it's just a mechanical expedient. Everyone knows what tapering is. So you don't need to have an advanced degree in engineering to understand the concept of tapering. Their expert, Mr. Sheldon, got a patent in 1985, 14 years before the priority data, the Asserted Patent, that talks about a bullet-shaped tip. And he said it was for ease of insertion. And then he tried to run away from that statement, said, well, no, bullets are round. So, you know, we cited at least half a dozen references below, and I can quickly rattle off the names, Balthasar, Voss, Loyler, Berger, Actor, Koch, and Werner, that either had tapered tips, they had the second bend at the front, they had all tapered tips, right? So you have to have inflection points. And there's no evidence that the location of the inflection point is critical. So we've been talking about the ratios, whether or not they're critical. The same is true about the inflection point. There's no evidence of criticality for any of the inflection points. And there's nothing in the patent that suggests otherwise. And Eduel argues that Judge Jordan erred in relying on our ratio cases. And the argument is that, well, whatever Koch teaches doesn't teach a ratio in this, it's really in opposite to the ratio cases he relied on. What's your comment on that? Well, I think what you're talking about is their range argument. And to me, it really boils down to a semantic distinction. Okay, we saw the picture of Koch. It's elongated, it's tapered, it's bullet shaped, whatever it is you want to call it, that's what it is. And we know, based on that, that A over B is less than one. So you can call that a range, or you can call it something else. It's really just a semantic distinction. It doesn't really make a difference if it's called a range or if it's called a single value. We know that it's less than one. And then the question is, if that's your point in the prior art, what does a person of ordinary skill take away from that? It's less than one. And again, they've said that their less than .08 is a range so I'm not quite sure why less than .1 would not be a range. But again, it's really just a way to refer to what everyone can see by picking up Koch. And the same, as I just said, is true with respect to LW. We all agree that Koch has four pedals and then there's this, what I think is an artificial dispute about the size of the pedals. It has to have an LW that's greater than one. And that's just because it's longer than a sphere. Once that happens, four pedals, then you get an LW of greater than one. And where you stop with the L, again, it's just an engineering exercise. Everybody knows if you make it too long, it's too pointy, it's uncomfortable. And if the pedals are too long and thin, they become unstable. And that's in the Berger patent that we cited in our brief. I think it was on page 14. That was just, again, routine engineering optimization that had been done. I think Berger did it in 1975, about 20 years before the priority date in this patent. And I mean, we can talk about the prior art, the patents that we've mentioned. There's also evidence that was not technically prior art, but P&G was working on this technology in 1965. Playtex itself was working on this a few months before the priority date. And so those aren't necessarily public, they're not necessarily prior art, but they are evidence of state-of-the-art. I think just one of the specific statements made in the district court's opinion that Edgewell criticizes is the statement made on page 17. This is Appendix 28. 28? 28, yeah. Appendix 28, the very beginning of the paragraph at the bottom. Here, the claimed ranges fall within the prior art because those ranges are encompassed by the AB ratios and L over W ratio shown in the Koch patent. Right. So if you look at the clear value case, which I believe Judge Crouse was the author of, the range in that case was similar to the range here. The prior art range, I think, in that case was less than 150 parts per million of alkalinity or something, and then the claim was less than 50. And in that case, and this is what Judge Jordan found, the claims were anticipated. And so here we have Koch that we all know is less than one for AB, and they're claiming less than 0.8. And so, again, is that a range, or is that? Well, we don't necessarily know that there's an L over W range in Koch of between one and two. It's pretty true. We do not know that. But we do know that L over W is greater than one. And like I said, that the point. But isn't that a mistake, then, on the part of the district judge? I don't think it's a mistake. I think he may have used the word range, perhaps incorrectly. But the fact is that Koch did have an L over W. Again, as a matter of simple, what we've all agreed is grade school math, it did have an L over W of greater than one. And once it's greater than one, it's within the one to two range. And then the question is, would a person of ordinary skill in the arts stop at some point? And the answer is yes. And where that person would stop is not a patentable event, as it were, right? It doesn't provide. Kind of a mystery of why two. Why? Mystery of why less than 0.8. There's nothing here that explains anything that's critical or special or unexpected or anything out of the ordinary. I agree with that. The L over W, to take a step back, means it can't be more than twice as long as it is wide. And that's what they've decided as a place to stop. And it could be three times as long, but then the point, the tip would become too pointy, the petals would become too narrow and they would open prematurely, the product could fall out in shipping. There's reasons that you don't want to have long, skinny petals. People for decades were aware of that. And you're absolutely right. There's no evidence that these numbers, that are frankly quite arbitrary, provide any criticality or any unexpected results. And that's exactly what the judge determined and I think he was absolutely right. So if there are no more questions, I think I will just sit down. Thank you. Thank you for your indulgence, your honors. I want to just touch on a few points based on your questioning of my friend. With respect to the range cases, the district court went down the path of the range cases and that was legal error. Because Koch or any other prior art does not teach a range, whether it be A over B or L over W. Koch does not teach a range. Koch teaches a single A over B point and a single L over W point, but we don't know what they are. But they're certainly not a range. Someone says to me, I know you live on a house on a particular street, I don't know which house. That doesn't mean I live in every house on that street. It means I live in one house still, you just don't know which one it is. So there is no range, there was never an invitation to go down the range path. And the discussion about whether it's optimization or routine experimentation, all that is subsumed within the range cases. That comes from In re Allers, from 1955, the CCPA, the predecessor court. That's the genesis of these range cases. And it makes sense in the context of the range cases because if the prior art teaches a range, but your patent claim is subsumed within that range, then you're getting a head start. You're getting a running start on your invention. And that's when it's appropriate to put an additional burden on you as the patentee to explain why do you deserve this patent when you had the running start in the first place? That is not this case, right? Judge Jordan flipped the burden. He presumed this patent was invalid and forced us to prove that it was valid. He flipped the burden on us. He changed the presumption of validity to a presumption of invalidity. And then to compound that error, he overlooked two significant secondary considerations of obvious factors, right? Specifically licensing. Edgewell paid a million dollar upfront licensing fee for the 075 patent for exclusive rights to it and then built a business around it a couple of years later. Copying. Indisputable evidence in the record, Your Honor. We have their emails. You have them in the briefs and the appendix. They cannot deny in good conscience that they copied our product. They copied every aspect of it, including and specifically the tip. Is the main evidence there, this email, which I have somewhere quoted? But there's one email which has some comments made. There is indeed that email, Your Honor. And it just says that they intend to develop a plastic applicator to a shape similar to your product to the extent possible considering the existing patent restrictions. Is that the money sentence? That's the money sentence for that email, but Your Honor. I'm not sure I find this compelling evidence of copying. How about the box? The box they sell their product in that says compare to Playtex Sport that has a picture of our tip on the back of it that they're emphasizing. They copied our product. If they want to pretend that they copied Kotch or copied the prior art, why is their product green? Why does their box say compare to Playtex Sport? Why do these emails say that they were copying our product as closely as they could? We know what happened. They could copy it as closely as they can and still not be within the exact infringement of your product. Exactly right, Your Honor. But they could have chosen to copy us at 0.9. If they just wanted something that's a little bit beyond the hemisphere, why not go with an A over B of 0.9? They didn't. They wanted our tip. I mean this evidence, the district court I think did a really good job on commercial success and found that even if you did have some commercial success this was so clearly obvious. Why wouldn't that same argument apply to this very minimal copying evidence? And your license argument to me sounds frankly strange because it's not a license. You're not licensing those patents to others. What if you took a license from somebody else on it? And that seems like an odd kind of license evidence that I haven't seen before. I don't see why it's any more compelling, or excuse me, any less compelling than if we had licensed the patent to others. We were paying a million dollars to have the exclusive rights for this tampon applicator tip shape, these ratios. Edgewell is a player in this space, a sophisticated competitor in this space. They wouldn't have done that for a patent that a person of skill in the art would have deemed obvious based on a reference that's on the face of the patent. Well how do we know that? Is there any testimony to suggest that? I mean they also may be a big company that decides, well there's this patent out here and it may be a problem, it may not be. In the scheme of things, I know you say a million dollars, but it's a million dollars over a long period of time, isn't it? Maybe that's just extra protection against an infringement suit. It has nothing to do whether it's obvious or not. We paid this license fee before we ever dreamed up this product, right? So this was, we paid the license fee in 2004. We don't start making this product until 2006. This is not a situation where we bought our way out of a potential problem down the road. This was a business judgment that this was technology worth owning. Okay, we've exhausted our time. Thank you very much, your honors. Thank you.